COOK, Circuit Judge.
A jury convicted Kevin and Sara Johnson of mail fraud, see 18 U.S.C. § 1341, and Kevin of making a false statement to a federal agent during an investigation, see 18 U.S.C. § 1001. In addition to imposing prison sentences, the district court ordered each defendant to pay restitution. The Johnsons appeal, pointing to prejudicial remarks by the prosecutor throughout trial; the district court’s failure to cure that prejudice with an appropriate jury instruction; and the district court’s determination of the amount of restitution without placing the issue before the jury. Kevin also challenges the district court’s denial of his motion for a continuance so that he could seek new counsel, and Sara contends that the district court improperly excluded certain evidence. Discerning no reversible error, we affirm.
I.
Kevin Johnson owned a landscaping/snow-removal company, Lansing Total Lawn Care (“LTLC”), in Michigan. The indictment charged him and his mother Sara (the company’s Human Resources officer) with orchestrating a scheme to “cause[] the payment of [unemployment] benefits to LTLC ... employees who had not in fact been laid off.”
The morning prior to voir dire, Kevin moved the court to postpone trial to allow him to seek new counsel, asserting that his attorney’s lack of preparedness caused a breakdown of trust. The court questioned the attorney and Kevin before denying the motion, assessing the situation as not sufficiently egregious to justify delaying trial.
At trial, the government presented voluminous evidence of Kevin and Sara’s fraud. Several former LTLC employees testified that Kevin or Sara typically would (1) apply for unemployment benefits on the employees’ behalf (R. 170, Trial Tr. (Hus *506 band) at 172-73; see also R. 119, Trial Tr. (Heddens) at 15-16; id. (Graham) at 91-92; id. (Therrian) at 112-13; id. (Alfaro) at 160-63); (2) report inflated past wages on the applications in order to increase the employees’ benefit (see, e.g., R. 171, Trial Tr. (Bognar) at 112); (3) require the employees to continue working without a regular paycheck, sometimes threatening to “cut [the employees] off unemployment” for failing to come to work or reporting the scheme to authorities (R. 170, Trial Tr. (Husband) at 175; see also R. 119, Trial Tr. (Heddens) at 25-27; id. (Graham) at 94); and (4) instruct the employees to report biweekly to the Michigan Unemployment Insurance Agency (UIA) to describe themselves as “unemployed” and thus eligible for continuing benefits (see, e.g., R. 170, Trial Tr. (Kellogg) at 62; R. 119, Trial Tr. (Alfaro) at 162-63). According to a federal investigator who prepared a chart analyzing LTLC’s false representations, UIA overpaid $315,471 to LTLC employees.
Kevin and Sara attempted to downplay their role in the scheme. Sara painted herself as absent from the office; and after several witnesses mentioned that her husband suffered from an illness during the relevant time period, she requested that the court admit his hospitalization records so that “the jury can take into consideration ... her focus and attention not necessarily being directed to the[ ] business.” (R. 120, Trial Tr. at 11.) The court excluded the records as irrelevant.
Moreover, the defendants pointed the finger at a non-defendant co-manager, Amanda Evans, because many witnesses tied her to the fraud. During closing arguments, Kevin’s attorney asked the jury rhetorically, “Why did we not hear from [Evans]?” (R. 121, Trial Tr. at 47.) The prosecutor rebutted by questioning “why they didn’t call Amanda Evans.” (Id. at 61-62 (emphasis added).) “Maybe,” the prosecutor continued, “because Amanda Evans knew where all the bodies were buried and they wouldn’t have liked the answers she was going to give you.” (Id. at 62.)
The jury found the Johnsons guilty as charged. Sara then moved for a new trial, arguing that many of the prosecutor’s comments constituted misconduct. The court denied her motion, finding that no comment reflected both impropriety and flagrancy.
The district court sentenced Kevin to 48 months’ imprisonment, Sara to 36 months, and ordered the defendants to pay restitution in the amount shown on the federal investigator’s chart, $315,470, without placing the issue before the jury.
This appeal followed.
II.

A. Kevin’s Motion to Continue His Trial

Kevin first argues that the district court abused its discretion in denying his motion to postpone the start of trial to allow him to seek new counsel. The trial judge enjoys “broad discretion” in deciding not to delay trial when a defendant requests a change of an attorney. See Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (“[O]nly an unreasoning and ‘arbitrary insistence upon expeditiousness in the face of a justifiable request for delay5 violates the right to the assistance of counsel.”). In United States v. Mack, 258 F.3d 548 (6th Cir.2001), we identified the relevant considerations that guide our review of the issue:
[W]e generally must consider (1)’ the timeliness of the motion, (2) the adequacy of the court’s inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was *507 so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public’s interest in the prompt and efficient administration of justice.
Id. at 556. Assessing these factors, each weighs in favor of upholding the court’s exercise of its discretion to deny the motion.
First, Kevin waited until the start of voir dire to request a change of lawyers, and we find motions untimely under such circumstances. See United States v. Vasquez, 560 F.3d 461, 467 (6th Cir.2009) (request made a week prior to the original trial date and again two weeks before the rescheduled trial date); United States v. Chambers, 441 F.3d 438, 447 (6th Cir.2006) (request made one and a half months before trial). Kevin counters that the day of voir dire was the first reasonable opportunity after the government disclosed, just 72 hours earlier, “witnesses and the Jencks Act material.” But he fails to explain what information in those materials ignited a sudden disagreement with his attorney.
Second, the district court thoroughly questioned both Kevin and his attorney about the alleged conflict between them. (See R. 169, Trial Tr. at 4-21.) Kevin thus “had ample opportunity to discuss in detail his complaints regarding [his attorney] and to respond to [the attorneyjs representations regarding their relationship.” See Vasquez, 560 F.3d at 467.
Third, nothing in the record reflects that the conflict could “result in a total lack of communication between attorney and client, preventing an adequate defense.” See United States v. Mooneyham, 473 F.3d 280, 292 (6th Cir.2007). When asked to articulate his conflict with counsel, Kevin offered only vague complaints that, for example, “nothing has been investigated” and the attorney “didn’t do what he’s supposed to do.” (R. 169, Trial Tr. at 9-10.) See United States v. Jennings, 83 F.3d 145, 149 (6th Cir.1996) (noting that “some dissatisfaction with counsel” is not enough to sustain motion). And though counsel expressed a general concern that the case was “not set ... up properly” and “underfunded,” he assured the court that he was “prepared to go forward.”
Fourth, “the public’s interest in the prompt and efficient administration of justice” supports the court’s decision. “When the granting of the defendant’s request would almost certainly necessitate a last-minute continuance, the trial judge’s actions are entitled to extraordinary deference.” Vasquez, 560 F.3d at 461 (internal quotation marks and brackets omitted). Prior to the time Kevin moved to replace counsel, an entire jury venire traveled to Grand Rapids for selection, and the government incurred considerable costs to transport witnesses to the area. Under these circumstances, we defer to the district court’s decision to deny a continuance.

B. Admissibility of Sara’s Husband’s Medical Records

Next, Sara argues that the district court abused its discretion in excluding her husband’s medical records because they supported her defense of being distracted from work during the relevant time frame. “Evidence is relevant if ... (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.” Fed.R.Evid. 401. “If a district court incorrectly excludes evidence, we will not reverse unless the error affected the defendant’s ‘substantial rights,’ Fed.R.Crim.P. 52(a), asking whether it is ‘more probable than not that the error materially affected the verdict,’ ” United States v. Dimora, 750 F.3d *508 619, 628 (6th Cir.2014) (quoting United States v. Davis, 577 F.3d 660, 670 (6th Cir.2009)).
Even if the district court erred in ex-eluding the records that showed the “number of [her husband’s] hospitalizations,” the jury heard ample testimony that Sara attended work “pretty much every day” and that she “[d]id [not] seem confused or distracted” at the office. (R. 119, Trial Tr. (Heddens) at 12; R. 170, Trial Tr. (Husband) at 168-69.) Witnesses testified that she “ran a lot of the business” (R. 170, Trial Tr. (Boak) at 7), often threatening workers to participate in the scheme (see, e.g., R. 170, Trial Tr. (Husband) at 175). Any error therefore did not prejudice Sara.

C. Prosecutorial Misconduct

The Johnsons together argue that various comments made by the prosecution violated due process, warranting the court’s declaring a mistrial. Sara also contends that the court abused its discretion in denying her new-trial motion premised on prejudicial comments. “To prevail, [the defendants] must show that the prosecutor’s remarks were not just improper but that they were ‘flagrant.’ ” Bedford v. Collins, 567 F.3d 225, 233 (6th Cir.2009) (quoting United States v. Carson, 560 F.3d 566, 574 (6th Cir.2009)). Flagrancy turns on “(1) whether the comment was likely to mislead the jury or otherwise prejudice the defendant; (2) whether it was an isolated occurrence or part of an extensive pattern; (3) whether it was made deliberately or by accident and (4) whether the prosecution’s other evidence was strong.” Bedford, 567 F.3d at 233. Though the Johnsons provide a litany of allegedly improper and flagrant prosecutorial comments, we distill them into four categories, none of which requires a new trial.
1. Comments conflating the defendants. Kevin and Sara first argue that various prosecutor comments “lump[ed] the two defendants together to paint the picture that the evidence offered was against both of them.” But much of the evidence was against both of them, and neither defendant points to anything in the record that actually was improper. For example, the prosecutor’s closing comment that “[t]he two of them were running this business” (R. 121, Trial Tr. at 66) comports with evidence that Kevin owned the company and Sara ran much of the business. Kevin cites a remark that incorrectly tied Sara to Kevin’s lie to the investigator, but the prosecutor promptly corrected his mistake by saying, “I’ll leave [Sara] out of that one.” (R. 121, Trial Tr. at 64.)
2. Comment regarding Amanda Evans. The Johnsons next argue that the prosecutor’s rebuttal comment about Evans — noting the possibility that the John-sons did not call Evans because she would have offered unfavorable testimony — shifted the burden of proof to the defendants. But the prosecutor never suggested that the burden of proof belonged to the John-sons and, instead, merely rebutted a similar comment made by Kevin’s attorney. When a defendant “implie[s] at closing that the government failed to call a witness because the evidence would be favorable to the defendant,” the prosecutor may properly comment that the “defense [too] could have called the witness if desired.” United States v. Newton, 389 F.3d 631, 638 (6th Cir.2004) (vacated on other grounds); see also United States v. Henry, 545 F.3d 367, 381 (6th Cir.2008) (“[I]f the prosecutor’s remarks were ‘invited,’ and did no more than respond substantially in order to ‘right the scale,’ such comments would not warrant reversing a conviction.”). Kevin’s counsel insinuated in his closing argument that the government failed to call Evans *509 because her testimony would undermine its case.[1] (R. 121, Trial Tr. at 48.) So the prosecutor's rebutting suggestion "was .. fair comment designed to meet the defense counsel's argument." United States v. Clark, 982 F.2d 965, 969 (6th Cir.1993).[2]
Kevin and Sara also insist that the prosecutor "bolstered" Evans's hypothetical testimony and implied that the prosecutor bore specialized knowledge that Evans would testify in favor of the government. But the prosecutor raised only the common-sense notion that "[m]aybe" Evans would testify unfavorably. (R. 121, Trial Tr. at 62.)
Even if we were to consider the prosecutor's comment improper, it prejudiced neither of the defendants given the overwhelming evidence against them. Several witnesses offered personal know!edge of Kevin and Sara participating in the scheme-that they placed employees on unemployment, threatened them into coming to work anyway, and taught employees how to lie to the UIA. No evidence suggested that Evans played an overriding role.
3. Comment regarding defense counsel's tactics. In his closing rebuttal argument, the prosecutor commented on defense counsels' aggressive cross-examination technique, calling it "the same thing" as the "threat[s]" the employees faced from Kevin and Sara at LTLC.[3] Citing no authority, the defendants interpret this comment as "suggesting it was trial counsel themselves who had been engaged with the defendants in some kind of protective scheme." The prosecutor merely drew an analogy to Kevin and Sara's conduct, however, and the comment falls within its "`wide latitude' [permitted] during closing argument to respond to the defense's strategies, evidence and arguments." Bedford, 567 F.3d at 233 (finding no impropriety in comment that defense attorney tried to "confuse" the jury by "fill[ing] the courtroom with .. smoke" (citations omitted)).
4. Comment that the defendants abused a "sacred trust." The final challenged comment involves a prosecutor's remark that "[ulnemployment is a sacred trust" ann that the "two defendants abused that trust for their own greed." (R. 121, Trial Tr. at 71.) Case law makes clear that "[n]othing prevents the government from appealing to the jurors' sense of *510 justice.” Bedford, 567 F.3d at 234. Though the defendants analogize to a case where the prosecutor suggested that a conviction would maintain national security during World War II, see Viereck v. United States, 318 U.S. 236, 247-48, 63 S.Ct. 561, 87 L.Ed. 734 (1943), this case reflects a more innocuous appeal to “send a message,” see United States v. Wiedyk, 71 F.3d 602, 610-11 (6th Cir.1995) (finding that “send a message” remarks do not rise to the level of denying a fair trial); see also Bedford, 567 F.3d at 234 (finding no impropriety in prosecutor’s comment that each juror could say, “I did [the victim] justice”).

D. Jury Instruction

The Johnsons’ penultimate contention concerns the court’s failure to issue a curative instruction regarding the Evans aspect of the prosecutor’s comments. During jury deliberations, the judge gathered the parties to propose a curative instruction because he “became a bit concerned” about the Evans comment. (R. 122, Trial Tr. at 4.) The judge’s proposal would have told the jury that (1) “the government bears the burden of proving guilt beyond a reasonable doubt,” (2) the jury “must make [its] decisions based only on the evidence ... heard in this courtroom,” and (3) the jury “may not engage in speculation as to what Ms. Evans may have said had she been called as a witness.” (R. 97-2, Proposed Jury Instruction.) Kevin’s attorney wanted the instruction, but Sara’s attorney disagreed because “the instructions that the Court gave previously were quite clear as is.” The judge agreed with Sara’s attorney and offered no curing instruction.
Refusal to deliver a proposed jury instruction warrants reversal only if it is “not substantially covered by the charge actually delivered to the jury.” United States v. Carson, 560 F.3d 566, 578 (6th Cir.2009). Here, the judge told that jury that (1) “It is up to the government to prove that [the defendants] are guilty, and this burden stays on the government from start to finish,” (2) “the lawyers’ statements and arguments are not evidence,” and (3) “Do not speculate about what a witness might have said_” (R. 121, Trial Tr. at 7-8.) The proposal covered no new ground, and the district court thus committed no error in not delivering it.

E. Restitution

Last, the Johnsons contend that the district court violated the Sixth Amendment by determining the amount of restitution on its own without presenting the issue to the jury. See Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Kevin and Sara acknowledge that their argument directly contradicts our holding in United States v. Sosebee, 419 F.3d 451, 461-62 (6th Cir.2005), that restitution falls outside the bounds of the Sixth Amendment.
The Johnsons instead argue that Southern Union Co. v. United States, — U.S. -, 132 S.Ct. 2344, 183 L.Ed.2d 318 (2012) — which held that a jury must determine the amount of a fine to the extent that the amount exceeds a statutory maximum — calls Sosebee into question. We recently rejected an identical contention in United States v. Jarjis, 551 Fed.Appx. 261, 261-62 (6th Cir.2014) (per curiam) (citing cases from three other circuits), “because restitution has no statutory maximum and because the Mandatory Victim Restitution Act mandates that judges determine the amount.”
Kevin and Sara similarly cite Alleyne v. United States, — U.S. -, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). But that case, which held that facts increasing the statutory minimum sentence of imprison *511 ment must be presented to a jury, lacks relevance for reasons similar to those noted in Jarjis. The district court thus committed no error in calculating restitution.[4]
III.
We AFFIRM.

. Sara argues that the government's comment prejudiced her more than Kevin because it was Kevin's attorney who insinuated that Evans would testify against the government. But because Kevin's attorney did not limit his comment to Kevin specifically, the government's rebuttal affected both defendants equally. Similarly, Kevin contends that the comment prejudiced him more because the prosecutor commented that Evans was "under ... defense subpoena" even though only Sara issued the subpoena. This comment lacked relevance, however, because the key point of the government's contention was that neither defendant called Evans-not that defendants subpoenaed Evans.

. Kevin makes a similar argument regarding a prosecutor's comment that Kevin could have played the end of a tape recording that formed the basis for his false-statement conviction. (R. 121, Trial Tr. at 63-64.) Kevin's attorney invited this comment, too, by saying to the jury, "Why did we not hear the rest of the tape?" and thus insinuated that the end of the tape would hurt the government's case. (Id. at 47.)

. Sara also quotes the prosecutor's comments that Kevin's attorney "basically ... called [one witness] stupid" and that Sara's attorney "called [another witness] a crack-head over and over again." She offers no separate argument, however, that these fleeting corn-ments deprived her of a fair trial. Moreover, though she complains that the prosecutor said she "seems to have been trying to evade paying her taxes, she develops no argument that this comment mischaracterized the evidence or prejudiced her in any way".

. Sara also attempts to extend Apprendi beyond statutory penalties to guideline calculations, arguing that the jury should have determined the loss amount attributable to her and whether a sentencing enhancement for managing a criminal scheme applied. But she again cites no authority for this novel proposition, and case law clearly dictates that Apprendi applies only to statutory penalties. See, e.g. United States v. Johnson, 732 F.3d 577, 584 (6th Cir.2013) (“Alleyne did not extend Apprendi to facts that do not increase the prescribed statutory penalties.”).